```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF OHIO
                       EASTERN DIVISION


Summer M. Smith,                  :

       Plaintiff,                 :

   v.                             :      Case No. 2:13-cv-582

                                  :      JUDGE JAMES L. GRAHAM
Commissioner of Social Security,         Magistrate Judge Kemp
                                  :
       Defendant.
```

REPORT AND RECOMMENDATION

I.  Introduction

Plaintiff, Summer M. Smith, filed this action seeking review of a decision of the Commissioner of Social Security denying her applications for disability insurance benefits and supplemental security income.  Those applications were filed on August 12, 2009, and alleged that Plaintiff became disabled on February 1, 2006.  Her onset date was subsequently amended to July 1, 2009.

After initial administrative denials of her applications, Plaintiff was given a videoconference hearing before an Administrative Law Judge on October 13, 2011.  In a decision dated December 15, 2011, the ALJ denied benefits.  That became the Commissioner's final decision on May 21, 2013, when the Appeals Council denied review.

After Plaintiff filed this case, the Commissioner filed the first certified administrative record on August 26, 2013, followed by the second certified administrative record which was filed on December 24, 2013.  The second record corrected an omission made in the first.  Plaintiff filed her statement of specific errors on September 25, 2013.  The Commissioner filed a response on December 26, 2013.  Plaintiff filed a reply brief on January 9, 2014, and the case is now ready to decide.

II.  <u>Plaintiff's Testimony at the Administrative Hearing</u>

Plaintiff, who was 29 years old at the time of the administrative hearing and had graduated from high school, testified as follows.  Her testimony appears at pages 50-80 of the administrative record.

Plaintiff was using crutches at the hearing, having just torn a ligament in her left foot.  In 2010, she had also been on crutches because she wore an immobilizing device on her left knee.  She did so for three to four weeks; the problem resulted from a fall.

At the time of the hearing, Plaintiff weighed 330 pounds.  Before having gastric bypass surgery, she had weighed 450 pounds.  She was separated from her husband and lived alone.  She had not driven a car in six months, based on her inability to stay focused.  She also had some physical problems that made driving difficult.

As far as employment was concerned, Plaintiff had last worked as a nurse's aide, caring for patients at a senior living center.  She left that job because she could not lift the patients and could not tolerate being on her feet.  She had also worked as a cook at a wildlife preserve, but quit after a disagreement with her supervisor.  In 2008, she had worked as a tire and lube support manager at a Wal-Mart, supervising automotive technicians.  That job ended when she married one of the technicians.  Other past work included waitressing, working at a silk-screening facility, being a cook at a camp, and working as an aide at a facility for mentally handicapped adults.

Plaintiff testified that she could not work due to lack of mobility.  She said that putting weight on her feet or any type of moving or twisting caused pain in her legs, knees, and ankles, and that she also had back pain occasionally.  In addition, she had lost control of her hands to the point where she could not

pick up objects like a bag of dog food.  She would also drop objects occasionally, and could not lift groceries.  Finally, she described severe depression accompanied by angry outbursts, and a desire to be alone.  That condition had existed for several years but had gotten much worse in the last six months.  She had lesser problems with her back, which limited her ability to sit, and stomach problems from the medications she was taking.

Plaintiff said that an average day for her was one where she could go to the doctor's office and go for lab tests.  She might have two such days per week.  On bad days, she did not leave her house.  She needed someone to accompany her to the grocery store.  When at home, she might stand or walk for two or three hours, but sometimes spent 90% of the time sitting down or otherwise off her feet.  She had five bad days per week on average.

When asked about various physical activities, Plaintiff said she could not touch her toes but could pick up an object off the floor if she had something to hold onto.  She also had problems manipulating small objects.  She avoiding climbing stairs and could not climb a ladder.  She had problems with supervisors.  She could follow written instructions, prepare her own meals, and dress and bathe herself.  She needed someone else to vacuum, mow the grass, and bring in and put away groceries.  She did laundry and washed dishes, and also used a computer, although she had a short attention span.  When seated at home, she was in a recliner with her feet elevated.  She no longer read or watched television due to an inability to concentrate.

### III.  The Medical Records

The medical records in this case are found beginning on page 246 of the administrative record.  The pertinent records can be summarized as follows.

In 2006, Plaintiff was hospitalized for surgery to correct an Arnold-Chiarai malformation.  The surgery was described as a

decompressive cervical and suboccipital craniotomy.  She appeared to recover successfully.  The first several exhibits in the medical records deal with this procedure.

Plaintiff's knees and ankles were X-rayed on August 15, 2008.  These studies showed some degeneration in the left ankle and no abnormalities in either knee.  (Tr. 454).  A cervical spine X-ray done fifteen days later showed some straightening of the spine and adenoidal hypertrophy but appropriate disc spacing. (Tr. 464).  An MRI of the left ankle done the same day did not show any significant abnormalities, and MRIs of the left and right knees showed a moderate lateral patellar tilt and subluxation as well as some chrondromalacia and joint effusion. (Tr. 465-70). These studies were preceded by an office visit to Dr. Schultz at which Plaintiff had reported progressively worsening knee and ankle pain, and Plaintiff reported similar symptoms, which she attributed to a fall at work, to Dr. Holt, an orthopedic specialist.  On October 7, 2008, Plaintiff underwent gastric bypass surgery.  She was discharged two days later in good condition. (Tr. 513-14).  Despite these issues, on December 22, 2008, she was cleared to return to work without restrictions. (Tr. 585).

In April, 2009, a diagnostic assessment done by Six County, Inc., indicated that Plaintiff was constantly depressed and angry.  She had seen a psychologist almost ten years earlier and believed she was bipolar.  She reported difficulty sleeping.  The diagnosis at that time was bipolar I, moderate, and her GAF was rated at 54.  The treatment goal was to reduce depression.  (Tr. 588-600).

On September 17, 2009, Plaintiff underwent a psychological evaluation conducted by Floyd Sours.  At the evaluation, Plaintiff reported depression, anxiety, and symptoms of post-traumatic stress disorder from having witnessed her mother being

-4-

shot in the face. At that point, she had stopped going to counseling. She reported having been diagnosed with sleep apnea and carpal tunnel syndrome. She had not worked since July, 2009. She reported minimal daily activities. Mr. Sours diagnosed major depression, PTSD, and generalized anxiety disorder, and rated Plaintiff's GAF at 61. Her limitations included mild difficulty in attending to tasks in a work setting, a mild impairment in relating to others, and a mild impairment in the ability to deal with work stress. (Tr. 782-85). Dr. Swain, a state agency reviewer, concurred. (Tr. 789-802). A later assessment by Dr. Dietz, also a state agency reviewer, indicated slightly more serious limitations, including a moderate impairment in the ability to understand, remember, and carry out detailed instructions, to maintain attention and concentration for extended periods, to complete a workday or work week without interruptions from her symptoms, to interact with others, and to respond to changes in the work setting. He thought she could complete 3- to 4-step tasks that did not have strict production standards or schedules and did not require her to direct or supervise others. (Tr. 919-36).

    Dr. McCloud, another state agency reviewer, completed a form on December 11, 2009, rating Plaintiff's physical capabilities. He generally restricted her to light work without postural, environmental, or manipulative limitations, noting that she had been released to go back to work in December, 2008. (Tr. 803-10). Dr. Hinzman confirmed that analysis on May 11, 2010. (Tr. 937). Prior to that, Dr. Dunmyer, who examined Plaintiff once, had completed a form indicating that Plaintiff could neither sit nor stand for more than an hour in a day and was markedly limited in most physical activities. (Tr. 1079-80). Another examining source, Dr. Newsome, had reported to Ohio Job and Family Services that Plaintiff was receiving ongoing treatment for multiple

medical problems, that she could stand or walk for four hours, could sit for six, and had a number of limitations in areas such as pushing and pulling, bending, reaching, handling, repetitive foot movements, and seeing.  (Tr. 760-61).

The file contains a number of progress notes from Six County, Inc.  In February and March, 2010, Plaintiff again reported constant anger, noting that she was hostile toward everyone and had more bad days than good.  Her symptoms were reported getting worse even with treatment.  (Tr. 829-37).  Her doctor changed her medication several times and recommended that she participate in anger management as well as continue individual counseling.  Plaintiff reported being manic in June of that year, and also told her counselor she was under a lot of stress and was "stuck in her depression and anger."  (Tr. 938-52).

A consultation note from January 21, 2011 indicted that Plaintiff had been previously diagnosed with fibromyalgia, bursitis, and tendinitis.  She also had a history of lupus anticoagulant.  The purpose of the consultation was for blood diseases, and no treatment was prescribed at that time.  (Tr. 1033-34).  Prior to that, Dr. Stainbrook saw her for complaints of joint pain; his note contains an impression of diffuse arthralgias and myalgias consistent with fibromyalgia, and he thought she should have an orthopedic evaluation, a psychiatric evaluation, and look into chronic pain management.  (Tr. 1076-77).

On August 5, 2010, Dr. Yee conducted a psychological evaluation of Plaintiff for the Muskingum County Department of Job and Family services.  Dr. Yee noted that Plaintiff's behavior was within normal limits but she presented as withdrawn.  Plaintiff reported constant depression with frequent crying spells as well as explosive outbursts.  Her memory and fund of

knowledge were moderate and her concentration was reduced. Dr. Yee concluded that Plaintiff met the diagnostic criteria for Bipolar I Disorder and PTSD and thought she was not a good candidate for work due to untreated mental health symptoms. Twelve months of mood stabilization and treatment was recommended. Dr. Yee rated Plaintiff's GAF at 59, indicative of only moderate symptoms, and concluded that she was moderately limited in eleven separate categories of work functions and markedly limited in her ability to complete a workday or work week or to perform at a consistent pace. (Tr. 1081-90). The file also includes a letter written by Dr. Yee relating to a different claimant in which Dr. Yee explained that, among other things, (1) someone who is moderately impaired in all four areas of functioning addressed by certain Social Security regulations "would be limited in ability to carry out many, but not all, complex tasks," (2) that precise percentages of impairment for mental health symptoms cannot be measured, and (3) that, using a range for this measure, the claimant in that case, who had "an overall moderate impairment in many functional areas" would be off task in the range of 25-35%. (Tr. 1091-92).

    A number of progress notes from Muskingum Valley Health Centers are also included in the record. They show that Plaintiff expressed continued complaints about both mental and physical problems, although they also indicate some improvement in psychological symptoms in the Spring of 2011 (but not much improvement in her foot, knee, or hip pain). She was tried on Neurontin for her fibromyalgia but reported no improvement. The same was true for Tramadol. On August 1, 2011, a social worker from Muskingum Valley completed a form assessing Plaintiff's mental functional capacity. A fair number of marked impairments were indicated, plus the likelihood that Plaintiff's condition would deteriorate under work stress. (Tr. 1199-1201).

IV.  The Vocational Testimony

A vocational expert, Dr. Robinson, also testified at the administrative hearing.  Her testimony begins at page 80 of the record.

Dr. Robinson identified Plaintiff's past work as including nurse's aide, a semiskilled, medium job, which Plaintiff performed at the very heavy level; cook helper, an unskilled, medium job; stores laborer, also unskilled and medium; waitress, an unskilled, light job; and factory worker, an unskilled, medium job.  There were no transferrable job skills.

Dr. Robinson was asked some questions about a hypothetical person who could work only at the sedentary level, could push and pull or operate foot pedals with her lower extremities, could occasionally climb ramps and stairs, stoop, kneel, crouch and crawl, and could not climb ladders, ropes or scaffolds.  Also, the person had to avoid working around unprotected heights or hazardous machinery and could handle and finger bilaterally. Finally, that person could perform only simple, routine, repetitive tasks in an environment without strict time or production demands and could have only superficial interaction with others.  According to Dr. Robinson, someone with those restrictions could not perform Plaintiff's past relevant work but could perform unskilled sedentary jobs such as sorter, inspector, and machine tender.

Dr. Robinson was next asked about a person who had not only those restrictions, but who could sit or stand for a total of only two hours in a workday and had other limitations.  She said that such a person could not find competitive employment.  The same was true for a person who would be off-task on a regular basis at least ten percent of the workday or who would miss two days of work per month.

V.  The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 22-37 of the administrative record.  The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff met the insured requirements for disability benefits through June 30, 2013.  Next, Plaintiff had not engaged in substantial gainful activity from July 1, 2009 forward.  As far as Plaintiff's impairments are concerned, the ALJ found that Plaintiff had severe impairments including obesity status post gastric bypass surgery, obstructive sleep apnea, fibromyalgia, osteoarthritis, lumbar and thoracic degenerative disc disease, carpal tunnel syndrome, major depressive disorder, bipolar I disorder, posttraumatic stress disorder, generalized anxiety disorder, and borderline personality disorder.  The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to the next step of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to perform sedentary work with these restrictions: she could not climb ladders, ropes or scaffolds, could occasionally climb ramps and stairs, stoop, kneel, crouch and crawl, could push and pull or operate foot pedals with her lower extremities, could frequently handle and finger bilaterally, could not work around dangerous moving machinery or unprotected heights, and was limited to the performance of simple, routine, three-to-four-step tasks in an environment without fast-paced production or strict time quotas.  Also, she could have only superficial interaction with others.  The ALJ found that, with these restrictions, Plaintiff could not perform her past relevant work, but she could perform the jobs identified by Dr. Robinson and that such jobs existed in significant numbers in the regional, State, and national economies.  Consequently, the ALJ concluded that

Plaintiff was not entitled to benefits.

### VI.  Plaintiff's Statement of Specific Errors

In her statement of specific errors, Plaintiff raises these issues: (1) the ALJ's decision should be reversed because the ALJ's weighing of the medical evidence was not supported by substantial evidence; and (2) the ALJ violated Social Security Ruling (SSR) 06-3p by failing to give any weight to the opinions of Plaintiff's social worker, Ms. Lutz.  She raised a third issue about completeness of the record which appears now to be moot.  The Court analyzes these claims under the following standard.

Standard of Review.  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'" Id.  LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985).  Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence.  Kinsella v. Schweiker, 708

F.2d 1058, 1059 (6th Cir. 1983).

### A. <u>Evaluation of Medical Opinions</u>

There are two parts to Plaintiff's first statement of error. She contends both that the ALJ did not properly evaluate Dr. Yee's opinion, rejecting its one "marked" limitation for improper reasons and failing to address its 11 "moderate" limitations at all, and that the ALJ should not have favored Dr. McCloud's opinion over the opinions expressed by two examining (but not treating) sources, Drs. Dunmyer and Newsome. The Court considers each of these arguments in turn.

The ALJ began his discussion of Plaintiff's mental impairment by describing the various records of examination and treatment, and then analyzed those records this way. First, Mr. Sours' opinion was given "little weight" because "it is not consistent with the claimant's longitudinal psychiatric history that demonstrates multiple severe mental impairments that limit her to unskilled, low stress work activities with limited social interaction." (Tr. 34). Little weight was given to Dr. Swain's opinion for the same reason. The ALJ gave Dr. Dietz' opinion "some weight" because it was seen as consistent with the record, including some evidence of recent improvement in Plaintiff's condition with medication. (Tr. 34-35). It was also viewed as consistent with her activities of daily living, but as somewhat inconsistent with evidence of her difficulties in social functioning. (Tr. 35).

It was in the context of these findings that the ALJ then turned to Dr. Yee's opinion. Taking the ALJ's comments in reverse order, he first gave "little weight" to the one marked limitation identified by Dr. Yee because of the GAF rating of 59 which Dr. Yee had assigned to Plaintiff's overall mental status. He then gave the same amount of weight to Dr. Yee's statement that Plaintiff was unemployable, both because that is (as Plaintiff concedes in her statement of errors) a decision

-11-

reserved to the Commissioner and because that statement was not supported by Dr. Yee's own findings "that the claimant has numerous normal mental status areas, along with her behavioral presentations." (Tr. 35).  The ALJ also gave no weight to the letter written by Dr. Yee describing his views of what moderate limitations meant in the context of a different case, stating that "it does not relate to this particular claimant."  Id.

When there is no treating physician opinion in the record, the ALJ is generally given substantial latitude in weighing the other medical evidence and resolving conflicts in that evidence. "Disagreement with how the ALJ decided to weigh differing opinions 'is clearly not a basis for ... setting aside the ALJ's factual findings.' Mullins v. Sec'y of HHS, 836 F.2d 980, 984 (6th Cir.1987)." Langenbahm v. Commissioner of Social Sec., 2013 WL 4517794, *6 (S.D. Ohio Aug. 26, 2013).  Nevertheless, applicable regulations and rulings, including SSR 96-06p, require certain criteria (including "the factors of supportability, consistency, and specialization," see Lawrence v. Astrue, 2009 WL 2461223, *11 (S.D. Ohio Aug. 11, 2009)) to be applied to medical opinions from non-treating sources.  And if "an ALJ completely ignores evidence from non-treating sources that is inconsistent with the ALJ's residual functional capacity assessment, a remand may be required." Nolan v. Comm'r of Social Sec., 2013 WL 1787386, *6 (S.D. Ohio Apr. 25, 2013), adopted and affirmed 2013 WL 4831029 (S.D. Ohio Sept. 10, 2013).

The ALJ in this case did not completely ignore Dr. Yee's opinions.  Further, at least some of the reasons given for discounting portions of those opinions - the relatively normal findings recited in Dr. Yee's report itself, and its inconsistency with other medical evidence, including Mr. Sours' consultative examination and report and Dr. Dietz's evaluation - accurately reflect the record.  In that context, the use of a GAF score as one factor in deciding not to give significant weight to

what amounts to a disabling limitation is not improper.  See, e.g., Amer v. Comm'r of Social Security, 2014 WL 1338115, *9 (S.D. Ohio April 2, 2014)(where other evidence also supports giving little weight to a non-treating source's opinion, "it was not error for the ALJ to rely, in part, on the GAF scores in the medical record in evaluating this opinion evidence").  Thus, the Court finds no error in the ALJ's use of the GAF score of 59, indicating moderate symptoms, as part of the basis for declining to accept Dr. Yee's opinions.

Plaintiff also argues, however, that the ALJ appears neither to have recognized nor analyzed the eleven moderate limitations which were found by Dr. Yee.  To some extent, this argument, even if accurate, represents no more than harmless error; several of those eleven limitations related to the ability to understand, remember, and carry out complex or detailed instructions, a limitation consistent with the ALJ's decision.  The ALJ also found that Plaintiff was moderately limited in her ability to maintain social functioning - which was part of Dr. Yee's opinion but not Dr. Dietz's - and that, as both Dr. Dietz and Dr. Yee found, she was moderately limited in her ability to maintain concentration, persistence, and pace.  Consequently, at least seven of the moderate limitations noted by Dr. Yee were incorporated into the ALJ's residual functional capacity finding.

As to the remainder, the ALJ explicitly referred to a number of the moderate limitations indicated by Dr. Yee, see Tr. 35, indicating that they were not totally disregarded, and also mentioned Dr. Yee's report earlier in the administrative decision (Tr. 32).  It is clear to this Court that the ALJ was fully aware of Dr. Yee's opinions in their entirety.  Again, given the ALJ's discretion to weigh the medical evidence and to resolve conflicts within it, the ALJ's decision to strike a balance between Dr. Dietz's opinion and Dr. Yee's was well within that discretion and provides no basis for reversing the administrative decision.

The other medical opinions which, according to Plaintiff, the ALJ did not properly credit, are those expressed by the non-treating examiners who evaluated Plaintiff's physical condition, Drs. Newsome and Dunmyer. Both performed evaluations for the Department of Job and Family Services. Plaintiff claims that the ALJ "made no attempt to account for the examining source relationship" between these physicians and Plaintiff, and that the ALJ improperly credited Dr. McCloud's opinion because "it is the only opinion which on its face would allow for full-time work." Statement of Errors, Doc. 11, at 15. In response, the Commissioner argues that there was no evidence in the record supporting many of the limitations described in Dr. Newsome's and Dr. Dunmyer's reports and that Plaintiff's activities of daily living were also inconsistent with those reports.

Again, this is an issue about which the ALJ has considerable discretion since neither Dr. Newsome nor Dr. Dunmyer was a treating source, and there is no treating source opinion to the effect that Plaintiff suffered from disabling physical limitations. Further, Plaintiff is incorrect that the ALJ relied heavily on Dr. McCloud's opinion that Plaintiff could perform a full range of light work. The ALJ expressly gave that opinion "little weight, as it is inconsistent with the medical evidence of record that establishes that the claimant has fibromyalgia, obesity, carpal tunnel syndrome, degenerative disc disease, and osteoarthritis" and because it "fail[ed] to take into consideration the credible portion of the claimant's allegations and testimony." (Tr. 33). As noted above, the ALJ found that, from a physical point of view, Plaintiff could do only a limited range of sedentary work. The ALJ credited Dr. Newsome's findings about Plaintiff's ability to stand, walk, and sit during a workday, but found no evidence to support his limitations on pushing, pulling, bending, reaching, bending, handling, seeing, and performing repetitive foot movements. In her Statement of

Errors, Plaintiff does not point to any evidence in the record supporting these findings.  The ALJ gave little weight to Dr. Dunmyer's extreme restrictions on Plaintiff's abilities for essentially the same reasons.

Plaintiff claims that the ALJ's decision rested, in part, on an incorrect credibility finding, arguing that her activities of daily living are not consistent with or indicative of the ability to perform work on a regular and sustained basis.  Even if that were true - and it is not accurate for at least one of her activities, a period of four months after her alleged onset date where she returned to work as a nurse's aide, a job which ranges from medium to very heavy in exertional level - the ALJ had other valid reasons for discounting the more extreme findings in Dr. Newsome's and Dr. Dunmyer's reports because there was no other medical evidence supporting such limitations.  The ALJ reached a reasonable compromise here among the three most pertinent opinions expressed about Plaintiff's physical capabilities, and there is no basis for reversal or remand on this issue.

### B.  The Counselor's Opinion

The other issue raised in Plaintiff's statement of errors relates to the ALJ's decision to disregard opinions expressed by Plaintiff's counselor, Melissa Lutz.  Plaintiff notes that under SSR 06-3p, all opinion evidence, including evidence from a non-medical source, must be considered to some extent by an ALJ, and cannot be rejected out-of-hand simply because the opinion has not come from a medical source.  She contends, however, that the ALJ did just that, and that a remand is needed so the ALJ can properly consider this evidence.  The Commissioner, in turn, argues that the ALJ had no duty to engage in an explicit discussion of Ms. Lutz' opinion, and in any event gave it the consideration required by law.

As explained in Potter v. Astrue, 2010 WL 2679754 (S.D. Ohio June 2, 2010), adopted and affirmed 2010 WL 2679753 (S.D. Ohio

July 6, 2010), although such a counselor is not considered an "acceptable medical source," and therefore not subject to the treating physician rule stated in 20 C.F.R. § 404.1527(d), a treating counselor's opinion cannot be rejected arbitrarily. Rather, Social Security Ruling 06-03p provides that the opinions of such sources "are important" and must be evaluated "on key issues such as impairment severity and functional effects, along with the other evidence in the file."  Consequently, as in Potter, if it is not clear how the ALJ applied SSR 06-03p or arrived at a residual functional capacity finding, a remand may be in order, and the same result may be required if an ALJ's decision does not set forth "some basis for why he was rejecting the opinion" of a non-medical source. Cruse v. Comm'r of Social Security, 502 F.3d 532, 541 (6th Cir.2007). It is important to keep in mind, however, that there is no requirement, as there is for opinions from treating physicians, that the ALJ articulate good reasons for his or her decision assigning specific weight to the opinion of such a source. See, e.g., Mulkey v. Comm'r of Social Security, 2011 WL 4528485, *6 (W.D. Mich. June 14, 2011), adopted and affirmed 2011 WL 4528479 (W.D. Mich. Sept.29, 2011) ("[b]ecause [claimant's therapist] is not an acceptable medical source, the ALJ was not required to provide good reasons for the weight given to her opinions under §§ 404.1527(d)(2), 416.927(d)(2)").

　　　Here, the ALJ did not engage in a lengthy discussion of Ms. Lutz's opinion, stating that the opinion was "given no weight since this individual is not an acceptable medical source as defined by the Regulations ...." (Tr. 34).  The ALJ cited to 20 C.F.R. §§404.1513 and 416.913, each of which defines who is an acceptable medical source, but each of which also says that an ALJ may consider evidence from other medical sources or other sources "to show the severity of your impairment(s) and how it affects your ability to work."  The ALJ went on to say, however,

-16-

that he did consider Ms. Lutz's opinion "to help the undersigned understand how the claimant's impairments affected her ability to work." Id. Earlier in his opinion, the ALJ cited to numerous sources of legal authority, including SSR 06-03p. (Tr. 28). The ALJ did not, however, explain exactly how he took Ms. Lutz' opinion into account. Nevertheless, when assessing Plaintiff's residual functional capacity, he did find that she was moderately limited in her ability to deal with others - something that Ms. Lutz had noted, see Tr. 1199 - and he did so based on "statements contained in the file concerning having problems with authoritative figures and being around people ...." (Tr. 35).

   This is, to be sure, not an extensive discussion of the counselor's opinion or a point-by-point refutation of her conclusions. That is not required by the case law, however. While this Court has not hesitated to remand cases where it was apparent that the ALJ did not, in fact, consider or evaluate the opinion of a source like a counselor consistently with the dictates of SSR 06-03p, see, e.g., Manus v. Commissioner of Social Sec., 2009 WL 2983051, *8 (S.D. Ohio Sept. 11, 2009), that would not be proper here. There is at least some evidence that the ALJ considered her opinion in the proper context, and the extreme limitations she noted - essentially the same as the ones noted by Dr. Yee - would clearly have been rejected by the ALJ for the same reasons, making any error essentially harmless. Consequently, although it would have been much more helpful to the Court had the ALJ included greater detail in his discussion of Ms. Lutz's opinion, both explicitly applying the factors set forth in SSR 06-03p and setting forth a rationale for giving her opinion no weight, the failure to do so here does not, under the particular facts of this case, justify a remand.

## VII. Recommended Decision

   Based on the above discussion, it is recommended that the plaintiff's statement of errors be overruled and that judgment be

entered in favor of the defendant Commissioner of Social Security.

### VIII. Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a _de novo_ determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation _de novo_, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. See _Thomas v. Arn_, 474 U.S. 140 (1985); _United States v. Walters_, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge

-18-